## BILL CARTER v. THE STATE.

### No. 3295. Decided November 4, 1914.

**1.—Murder—Fabricated Testimony—Motion for New Trial.**

Where, upon trial of murder and a conviction of said offense, defendant's motion for new trial to which was attached the affidavit of the main prosecuting witness showing that her testimony on the trial of the case, and which was material to the prosecution, was false in a number of important particulars, and further showed that she gave the false testimony by reason of threats and inducements of third parties, a new trial should have been granted.

**2.—Same—Manslaughter—Adequate Cause—Female Relative.**

Where, upon trial of murder, it developed that the female who testified for the State had promised to marry the defendant, who claimed that he had found her and deceased in a compromising situation, and that the deceased was about to commit rape upon her when defendant interfered, whereupon deceased drew a pistol upon him and defendant had to flee, and on the same evening of said day made an attack upon him with a knife when he killed the deceased, all of which said female denied upon the trial, but by her affidavit attached to the motion for new trial swore that defendant's testimony was substantially correct, the issue of manslaughter was properly raised, although this was not statutory adequate cause and not an insult to female relative.

**3.—Same—Rule Stated—Manslaughter.**

The Code declares that certain things shall be deemed cause sufficient to reduce an unlawful killing to manslaughter and that certain other things shall not be deemed sufficient, and when none of these things mentioned in the Code are disclosed by the evidence, yet the testimony shows a cause or causes aris-

ing at the time or in connection with the killing as will produce a degree of anger, fear or rage, etc., such as to render the mind of an ordinary person incapable of cool reflection, etc., the offense would be manslaughter.

### 4.—Same—Self-defense—New Trial—False Testimony.

Where, upon trial and conviction of murder, the defendant testified that deceased assaulted him with a pistol the evening before the night of the homicide, and that the acts of the deceased at the time of the killing led defendant to believe his life was in danger, and the affidavit of the main prosecuting witness on motion for new trial showed that she had been induced to swear falsely upon trial and that the testimony of the defendant was substantially true, and that the State had used false testimony to discredit the plea of self-defense by defendant, a new trial should have been granted.

### 5.—Same—Evidence—Clothing of Deceased.

Where the point of entrance of the fatal shot was an issue in the case, there was no error in admitting the clothing of deceased in evidence.

### 6.—Same—Evidence—Leading Questions.

State's counsel should never by his questions suggest an answer to a friendly witness, but, as the judgment is reversed on other grounds, this need not be discussed.

### 7.—Same—Argument of Counsel.

Counsel for the State should not appeal to passion and prejudice of the jury, and should always confine his remarks to the evidence and the legitimate deductions therefrom.

### 8.—Same—Evidence—Bias of Witness.

All legitimate testimony tending to show the interest of a State's witness should have been admitted.

### 9.—Same—Evidence—Credibility of Witness.

The fact that a woman has been raped is not admissible as affecting her credibility as a witness, and such testimony was inadmissible.

Appeal from the District Court of Comanche. Tried below before the Hon. J. H. Arnold.

Appeal from a conviction of murder; penalty, twenty-five years imprisonment in the penitentiary.

The opinion states the case.

*S. W. Bishop* and *J. B. McEntire* and *J. R. Stubblefield,* for appellant.—On question of insult to female relative: Williams v. State, 65 Texas Crim. Rep., 437, 144 S. W. Rep., 620; Lane v. State, 29 Texas Crim. App., 310; Clanton v. State, 20 id., 615; Aikin v. State, 56 Texas Crim. Rep:, 324; Tucker v. State, 50 S. W. Rep., 711.

On question of fabricating testimony and repudiating testimony on trial: McGaughey v. State, 169 S. W. Rep., 289.

On question of court's charge on self-defense and that same should have been independent of the question of threats: Lundy v. State, 59 Texas Crim. Rep., 131, 127 S. W. Rep., 1032; McDowell v. State, 55 Texas Crim. Rep., 596; Swain v. State, 48 id., 98; Fuller v. State, 50 Texas Crim. Rep., 14, 95 S. W. Rep., 1039.

On question of argument of counsel: Davis v. State, 54 Texas Crim. Rep., 236; Smith v. State, 55 id., 563.

On question of credibility of witness: Young v. State, 54 Texas Crim. Rep., 417.

*C. E. Lane,* Assistant Attorney General, for the State.

HARPER, JUDGE.—Appellant was prosecuted and convicted of murder and his punishment assessed at twenty-five years confinement in the State penitentiary.

All the evidence would show that appellant and deceased were personal friends up to the day that the homicide took place at night. That their first open rupture took place in a pasture on the way from the house of deceased's father, E. N. Graham (where deceased lived), to the home of Carl Graham, where appellant was at that time making his home. Deceased was walking with one Bertha King, a sister of his brother Carl's wife. Appellant walked up on them in this pasture, and as to what appellant saw and did, there is a variance in the testimony, but all the testimony goes to show that deceased there cursed appellant, calling him a s—n of a b—h, and that appellant fled, and was overtaken by deceased and his brother, Jim Graham, and the witnesses vary as to what then took place; but it is made apparent that appellant, after they had separated, began to tell that deceased had attempted to rape Bertha King; that deceased and his brothers, Carl and Jim Graham, were aware of the fact, and were also made aware that appellant had gone to the home of the father of Bertha King for the purpose of informing him that deceased had attempted to rape his daughter. It is also made apparent that appellant thought deceased was going to flee the country, and he made efforts to have deceased arrested if he did so.

The State's case is that deceased had not attempted to rape Bertha; that the reports appellant was circulating were fabrications, and made from ill-will because he thought deceased had superseded him in the affections of the girl, and his acts and conduct on that occasion were brought about, not by reason of the fact that he had seen deceased attempt to rape the girl, but because of his belief that deceased had succeeded in alienating the affections of the girl from him. It is an admitted fact that the girl and appellant had theretofore been engaged. It is further shown that when appellant was at the home of Mr. King he secured the shotgun with which he afterwards killed deceased, claiming at that time he was going to Gorman to get the officers to assist in the arrest of deceased. The State further showed that he did not go to Gorman, but when he got near the residence of Carl Graham (where he had been staying and where Bertha King was also staying) he got out of the buggy and went to the home of Carl Graham and called for him. Carl Graham was not at home, having gone to Mr. King's to see what appellant had told in regard to the alleged escapade of Clyde (the deceased) and Bertha. When appellant called for Carl, Clyde

came to the door, and appellant backed off, and told Clyde he did not want to see him,—not to come out there. When informed that Carl was not at home, he asked for Bertha King; she at first refused to go out, but finally did go to the gate in company with her sister Nellie. Appellant asked Nellie to go in the house as he wanted to talk with Bertha. This she refused to do, and both girls returned to the house. Those in the house tried to get appellant to come in, but he declined to do so, claiming that Clyde was armed, and he was afraid to do so. They insisted that Clyde was not armed, and Bertha showed appellant the pistol, and said she would put it away. While this conversation was going on, deceased left the house, and went to near where appellant was standing on the outside of the gate, and the State's contention is that appellant then shot Clyde at a time when his back was turned to him, and when he was making no demonstration of any kind.

Appellant testified that he and Bertha King were engaged to be married; that he walked upon deceased and Bertha in the pasture, and Bertha was on the ground and deceased on top of her; that he thought deceased was trying to rape his promised wife; that at his appearance deceased jumped up, drew a pistol and snapped it at him; he ran when deceased pursued him, cursing him. Later in the evening he saw Bertha and she then told him that deceased had in fact tried to rape her, and was going to kill him, appellant; that he was also informed that deceased was going to leave the county that night. Having been informed that deceased was going to kill him, appellant says he attempted at several places to borrow a gun, and finally got one at Mr. King's; that he went there to inform Mr. King of the attempted rape on his daughter, and of deceased's intention to flee the county. That he did make this report to Mr. King is shown by all the testimony. He says he notified the officers of the assault and deceased's intention to flee, and asked that they arrest deceased. In this he is corroborated. Being unable to get the officers at Gorman by telephone, he engaged a buggy to take him there, and started to Gorman, but as Mr. King had asked him to bring Bertha home, when they got even with Carl Graham's house, he asked the driver to go on and tell the officers at Gorman, he intending to get Bertha and take her to her father's—that he went to Carl Graham's house for this purpose, not knowing that Clyde Graham (the deceased) was there. It may be here said that Bertha King and the wife of Carl Graham were sisters. He went up to Carl Graham's and called for him. Clyde responded, when appellant told him he did not want to see him. Learning that Carl was not at home, he asked to see Bertha, and was asked to come in the house, but he declined, fearing trouble with Clyde. Bertha declined to talk to him privately, and they kept insisting on him to come in the house; when he did not do so, deceased left the gallery and approached the gate, appellant being outside; appellant says when deceased got near him, deceased made a threatening gesture, and sprang towards him, when he fired, shooting twice; deceased fell, and a witness for appellant says when he went to

the place where deceased fell deceased's knife was lying there on the ground open. The State denied there was a knife picked up off the ground.

This is a sufficient statement to render intelligible the rulings of the court. After Bertha King had testified on the trial as hereinbefore stated, on motion for a new trial she attaches an affidavit stating that her testimony was false in a number of particulars, and she was induced to give the false testimony by Carl Graham, Mark Mahan and others.

Appellant testified on the trial that on that day he had loaned his pistol to Bertha King, and she had carried it with her when she left Carl Graham's house. On the trial of the case she testified this was false, and said she did not at this time, nor at any other time have appellant's pistol. On the motion for new trial she says her testimony was false, and that she did have appellant's pistol, and he told the truth about the matter. Appellant testified that when he came upon Bertha King and deceased in the pasture, deceased had her down and was attempting to ravish her, or so it appeared to him. On the trial Bertha King testified that this testimony was untrue and that deceased had not tried to ravish her. On the motion for new trial she swears that her testimony on the trial was false, and that appellant's testimony on the trial was true; that deceased had in fact thrown her on the ground and was attempting to ravish her when appellant appeared on the scene.

On the trial appellant swore that when he approached the couple, deceased jumped up, pulled the pistol he had loaned Bertha King, and snapped it at him when he fled. Bertha swore this was untrue on the trial and said she did not have appellant's pistol; that deceased pulled no pistol, and did not attempt to shoot appellant. She now swears that she did have appellant's pistol, and deceased took it away from her and did throw her on the ground, and that when appellant approached, deceased did jump up, draw the pistol and attempt to shoot appellant, and continued to try to do so, as appellant fled.

On the trial appellant testified that he saw Bertha that evening late, and Bertha told him that deceased was trying to rape her, and if she could she would kill him. On the trial Bertha denied this conversation and said that she at this, or any other time had never told appellant that deceased had attempted to rape her. She now says that her testimony was false; that on the trial appellant told the truth, and she did tell appellant exactly what he testified she told him. A witness for appellant testified to deceased's knife being picked up, open, where he fell. On the trial Bertha testified that no knife was picked up out there. Now she swears that not only was the knife out there as testified by appellant's witness, but that Carl Graham had them stand in position where he could not be seen, when he went and got the knife and concealed it.

Many other contradictions appear in her testimony given on the trial, and her testimony on the motion for new trial, but the above excerpts show the material points, and that she was used on the trial by the State to show that appellant's entire defense as testified to by him was

a fabrication pure and simple—that deceased did not attempt to rape her; that deceased did not assault appellant with a pistol; that she had not told appellant that deceased had tried to rape her, and that deceased had no knife when appellant shot him. She also, on the trial, denied that she was engaged to be married to appellant, as appellant testified; she now admits that appellant told the truth in this respect also. She gives as a reason for giving the false testimony on the trial, that Carl Graham and Mark Mahan told her if she did not testify as they desired she would be implicated in the killing of Clyde; that her character would be ruined, etc., and for these reasons she was induced by them to give this false testimony on the trial.

This is denied by Carl Graham and Mark Mahan, but she produced letters from Mark Mahan and Dink Worrell corroborating her to the extent, at least, that they were promising and offering inducements to her if she would "stick to her testimony" given on the trial, and under such circumstances we do not think we should permit a conviction to stand obtained on such testimony. Had she testified on the trial as she now does, and as appellant testified on the trial,—that they were engaged to be married; that appellant came up while deceased was attempting to rape her; that deceased jumped up, assaulted appellant and attempted to kill him, and said he was going to kill him; that she told appellant of these matters; that appellant refused to come in the house, saying he was afraid of Clyde, and asked Clyde not to come out where he was,—that he did not want to talk to him, and was afraid of trouble with him; that in spite of this Clyde went out there, and that an open knife was found where he fell, no jury would likely have been authorized to find that appellant, at least, did not believe that deceased had that afternoon attempted to rape his promised wife; in the light of this testimony, the whole record teems with evidence that appellant did so believe, and while being a promised wife, does not make the girl a female relative within the provisions of the statute, and the court did not err in so refusing to instruct the jury, yet our code declares that certain things shall be deemed cause sufficient to reduce an unlawful killing to manslaughter, and that certain other things shall not be deemed sufficient. When none of these things mentioned in the code are disclosed by the evidence, yet the testimony discloses a cause or causes, arising at the time, or in connection with the killing, as will produce a degree of anger, fear, or rage, such as to render the mind of an ordinary person incapable of cool reflection, and the jury believes that such cause or causes did produce such a state of mind, then the offense would only be manslaughter.

If Miss King had testified on the trial as she testifies on the motion for a new trial, and the court had aptly presented the law,—that if appellant believed that deceased had attempted to rape Miss King, and they further believed that appellant and Miss King were engaged to marry one another, and that that afternoon deceased had attempted to shoot and kill appellant, and believed that deceased approached appellant that night, and from any and all of these acts, appellant's mind was

rendered incapable of cool reflection by anger or fear (even though deceased did not at that time attempt to slay appellant) would the jury have found appellant guilty of any graver offense than manslaughter? We can not say they would. On the other hand, if Miss King had not been used as a witness by the State, and appellant's testimony as to the attempt to rape, to the assault and snapping a pistol at him, etc., had gone to the jury uncontradicted by Miss King, would the jury have found him guilty of a graver offense than manslaughter? This question we can not answer in the affirmative to our satisfaction from this record. She was used on the trial to prove that appellant's testimony as to the rape, assault on him with a pistol, etc., was untrue, and render as probable the true motive was the jealousy of appellant,—that he thought deceased had superseded him in the affections of the girl. Her testimony on the trial was such as to cause the jury to believe this was the motive for the killing, and but for her testimony there would have been but slight if any testimony to support such theory, as the testimony other than hers on the trial went strongly to show that the killing grew out of what appellant believed was an attempt to rape his promised wife, and if the jury had so found,—and might have done so but for her testimony,—under proper instructions, they probably would have convicted him of no higher grade of offense than manslaughter.

Again, appellant testified to an assault on him with a pistol by deceased that evening, and that this circumstance, together with the acts of deceased at the time of the killing, led him to believe his life was in danger. Had the jury believed the assault was made with a pistol in the afternoon, they could better have judged appellant's viewpoint at the time of the fatal shooting. The State used Bertha King, the only other immediate eyewitness, to disprove the use of a pistol in the afternoon, and that deceased snapped it at appellant. She now says her testimony in this particular was false, and says deceased did attempt to shoot appellant as testified to by him on the trial. Without giving any weight to her testimony, we can readily see that according to her sworn statement, the State used false testimony to discredit the self-defense plea of appellant, and but for this false testimony, we can not say from this record, what would have been the finding of the jury on this issue.

In making these comments we do not wish to be understood as reflecting on the court, the district attorney or any officer of the court, or lead anyone to think this court has the least idea that they or either of them had any part or parcel in getting this girl to swear as she did on the trial, but it is made manifest that this defendant has been given virtual life imprisonment upon testimony that the witnesses themselves say is false and perjured, and no reason is shown why they now so testify, but ample reason is shown in the record why they were induced to testify on the trial, as they did by Mark Mahan and Carl Graham.

The court did not err in admitting the clothing of the dead man in evidence. The point of entrance of the shot was an issue in the case, and the clothing shed material light on this issue.

Those bills complaining of leading questions on the trial need not be discussed. State's counsel should never by his questions suggest an answer to a friendly witness, and we hope this will not occur on another trial. The same may be said about the bills complaining of the remarks of the district attorney in argument. The bills do not present reversible error, but counsel should not appeal to passion and prejudice, and should always confine their remarks to the evidence and legitimate deduction therefrom.

All legitimate testimony tending to show the interest and bias of the witness Mark Mahan should be admitted on another trial, if the State should again use him as a witness.

Testimony that a certain person had been sent to the penitentiary upon a plea of guilty to having raped the State's witness, Iva Lee, was properly excluded by the trial judge. Rape is a sin against the woman injured, and the fact that a woman has been raped is not admissible as affecting her credit as a witness.

The other matters complained of will not likely occur on another trial, but on account of the matters hereinbefore discussed, the judgment is reversed and cause remanded.

*Reversed and remanded.*