## BILL CARTER v. THE STATE.

### No. 3808.   Decided January 12, 1916.

**1.—Murder—Charge of Court—Means Used by Deceased—Negative—Presumption—Words and Phrases.**

Where, upon trial of murder, the court, in submitting the question of presumption of use of deadly weapons by deceased, erroneously charged that it is not to be presumed that the person using or attempting to use such weapon designed to commit murder or to inflict serious bodily injury, the same was reversible error. Prendergast, Presiding Judge, dissenting, holding that the use of the word "not" must have been the mistake of the clerk in copying the charge.

**2.—Same—Charge of Court—Threats—View of Defendant.**

Where, upon trial of murder, the court's charge on self-defense connected with threats failed to charge the question on executing the threats that the same must be viewed from the standpoint of the defendant, the same was reversible error. Prendergast, Presiding Judge, dissenting.

**3.—Same—Evidence—Declarations of Third Parties.**

Upon trial of murder, matters which occurred between the witnesses out of the presence and hearing of the defendant should not have been permitted to go to the jury.

**4.—Same—Evidence—Declarations of Third Parties.**

Upon trial of murder, it was error to admit in evidence what was said by the wife of defendant with reference to declining to go back to the defendant to live with him; although the facts that she declined to do so was admissible.

**5.—Same—Evidence—Witnesses Under Rule.**

On trial of murder, it was improper to admit in evidence the fact that one of the witnesses after he retired from the witness stand was seen in close conversation with some of defendant's witnesses who were all under the rule, to afford ground of impeachment.

**6.—Same—Reference to Former Trial.**

On trial of murder, the State should not have been permitted on cross-examination of one of defendant's witnesses to ask her whether her daughter did not tell her after a former trial that they were going to change their testimony.

**7.—Same—Evidence—Letter—Bias of Witness.**

Where a State's witness gave important testimony for the State and testified on cross-examination that he had written a certain letter to one of the witnesses, the defendant should have been permitted to introduce this letter in evidence to show thereby that said State's witness was seeking to suppress testimony, said State's witness being a brother to deceased, etc.

**8.—Same—Evidence—Letter—Credibility of Witness.**

Upon trial of murder the defendant tried to show the intent and interest that a certain State's witness was taking in the case and that he was trying to suppress testimony or fabricate it by reason of a certain letter he had written, the defendant should have been permitted to introduce such letter in evidence.

**9.—Same—Other Transactions—Other Offenses—Evidence.**

Upon trial of murder, it was error to admit in evidence testimony as to an assault by the defendant on another party not connected with the instant case, giving all the details of the said former difficulty.

**10.—Same—Witness—Husband and Wife.**

Where, upon trial of murder, the State's counsel called the wife of the defendant as a witness in the presence and hearing of the jury, the same was improper; however, the court informed the district attorney that she was not a competent witness and she was not placed upon the witness stand. Upon another trial defendant's wife should not be called as a witness.

Appeal from the District Court of Comanche. Tried below before the Hon. J. H. Arnold.

Appeal from a conviction of murder; penalty, twenty-five years imprisonment in the penitentiary.

The opinion states the case.

*S. W. Bishop, J. B. McEntire,* and *J. R. Stubblefield,* for appellant.— On question of charge of court: Melton v. State, 71 Texas Crim. Rep., 130, 158 S. W. Rep., 550; Carter v. State, 170 S. W. Rep., 739.

On question of charge on self-defense: Lyons v. State, 159 S. W. Rep., 1071; Bussey v. State, 69 Texas Crim. Rep., 98, 153 S. W. Rep., 873.

On question of cross-examination of witness: Grant v. State, 42 L. R. A. (N. S.), 428.

*C. C. McDonald,* Assistant Attorney General, and *Gib Calloway,* District Attorney, for the State.—On question of court's charge: Lewis v. State, 59 Texas Crim. Rep., 51.

On question of declarations of third party: Greene v. State, 17 Texas Crim. App., 395.

DAVIDSON, JUDGE.—Appellant was allotted twenty-five years in the penitentiary for murder.

This is the second appeal, the first being reported in 75 Texas Crim. Rep., 110, 170 S. W. Rep., 739. The case is practically as before with the exception that two of the witnesses, Bertha and Nellie King, testified this time for appellant. On the former trial they were State's witnesses. This involved some change in the testimony so far as their evidence is concerned. There was a witness named Wilson who testified on this trial in regard to a difficulty between himself and appellant, which was not in evidence on the former trial. Quite a number of exceptions were reserved to the charge of the court and refusal to

give special charges. These will be noticed in a general way so they may not occur upon another trial.

Among other things, this quotation is made from the court's charge: "When a homicide takes place to prevent murder or the infliction of serious bodily injury, and the weapon or means used by the person attempting to commit such murder, or to inflict such injury, is such as would have been calculated to produce that result, it is *not* to be presumed that the person so using or attempting to use such weapon, designed to commit murder or to inflict seriously bodily injury." This would have been a correct charge with the underscored word "not" omitted from the charge, but as given it was exactly the reverse of the statutory requirement.

This quotation is also made: "When a defendant accused of murder seeks to justify himself on the ground of threats to do him serious bodily injury, he is permitted to introduce evidence of the threat or threats so made; but the same are not to be regarded as affording a justification unless it be shown that at the time of the homicide, by some act then done an intention was manifest to execute the threat or threats so made." Upon another trial we suggest that this phase of the charge be amended so as to include the idea that "or that it so reasonably appeared to the defendant at the time."

This expression also occurs in the charge: "If, however, you believe from the evidence beyond a reasonable doubt that the defendant with a shotgun fired upon and killed the deceased, Clyde Graham, not for the purpose of protecting his person from unlawful violence from the said Clyde Graham and not because of reasonable apprehension at the time that the said Clyde Graham was using or was about to use unlawful violence upon him, the defendant, then he can not justify the killing of said Graham, if he did kill him, as done in his lawful defense." In view of the whole charge and the emphasis of the various provisions of the charge in regard to the question of self-defense, we are of opinion this should not have been given. We suggest upon another trial this clause be omitted. It is deemed unnecessary to go into a discussion of those matters further than above stated.

A bill of exceptions recites that Jim Graham was permitted, over objection of appellant, to testify as follows: "I remember an occasion some time before the killing, when Bill Carter, Clyde Graham and I and Iva Lee Stephenson, Bertha King and Nellie King went to Oakland to preaching. We walked, and we went from Carl's house and back to Carl's house. I went with Nellie King, Clyde Graham went with Iva Stephenson, and Bill Carter went with Bertha to Oakland, and on return from Oakland, at the request of Bill Carter, we changed partners, and Bill Carter came home with Iva Lee, I came home with Nellie King, and Clyde Graham came home with Bertha King. At the time Bill wanted me to change partners we were about 150 or 200 yards from Oakland. Nellie and I and Bertha King and Clyde Graham went on home, and we had been there some time before Bill Carter and Iva Lee Stephenson came up. I do not know whether Bill and

Iva Lee went the same road which we went or not. When Bill Carter and Iva Lee came up to Carl's house I went with her to her home. Bill Carter and Iva Lee Stephenson came up to Carl's gate and Bill came in, and told me to go home with Iva Lee Stephenson, and I did not know why he wanted me to do that, and when I got out there Iva Lee Stephenson told me she would not go on the rest of the way with him. I then went on home with Iva Lee Stephenson. She said she would not go on any further with Bill Carter. I did not know what Bill had done or tried to do." We are of opinion these matters that occurred between the witness and Iva Lee Stephenson and the conversation, being out of the presence and hearing of the defendant, should not have been permitted to go to the jury. Various objections were urged, which we deem unnecessary to discuss. We think this testimony should be excluded upon another trial. The court let it in upon the theory, it seems from his explanation, that most of this was in the presence of the defendant, except the statement of Iva Lee Stephenson made to Jim Graham as they started to the home of Miss Stephenson, and these statements were told to the defendant the next day, when the witnesses state that they talked and laughed about what transpired the night before, the information being brought home to the defendant on the next day after the trip to Oakland, referred to in the bill. We do not think this statement of the judge cures this error. This testimony should not go to the jury. The same may be said of bill No. 14, referring to the same matter.

Another bill shows that the witness Carl Graham at the request of appellant went with him to Cameron for the purpose of seeing appellant's wife. That witness had a conversation with the wife in reference to inducing her to go back and live with her husband, which she declined. He then repeats what was said by the wife in regard to the matter, in which she declined to live with appellant. What the wife said in regard to this matter seems to be inadmissible. The fact, however, that appellant sought to obtain the consent of his wife to live with him again, perhaps, was admissible, but her statements in regard to the matter would not be. Upon another trial such testimony will not be permitted to go to the jury.

Another bill shows that Arnold King testified for the State, and on cross-examination stated that on the night of the homicide Bill Carter came to his father's house and made the statement that Clyde Graham had raped his sister, and that he was seeking and trying to get the officers after the said Clyde Graham. Be it further remembered that prior to the time that the said Arnold King went on the stand, that Jim Graham had testified, at the instance of the State, and on cross-examination by defendant stated that, at a former trial of the case, he had not given to Arnold King a knife while in the town of Comanche, and during the trial of the case, and further, that he had not seen a knife lying near where his brother had been killed, and further, on cross-examination of the witness Arnold King, the said witness had made a statement at a former trial of this case, and during the trial,

and while in Comanche, the witness Jim Graham had delivered to him a knife, and at the time of doing so the said Jim Graham had made the statement that they might want to see the knife, and that he would tell them the knife was at home. And further be it remembered that after the witness Arnold King had testified to the said facts, and had retired from the witness stand, the State then placed witnesses B. T. Simmons and M. L. Harris on the witness stand, and they testified in the presence and hearing of the jury, and over the protest and objections of the defendant, that soon after the witness Arnold King had retired from the witness stand they had seen the said witness, Arnold King, in close consultation with his mother and with Bertha King, in the office of the county attorney, and while talking to his mother and sister, Bertha King, who were witnesses in the case, was in a suspicious attitude, but that they did not know what the said Arnold King told his mother or sister. Various and sundry objections were urged to this. We believe that this should not have gone to the jury as impeaching testimony of Arnold King. The mere fact that he talked to his mother and sister after he had testified before the jury, without showing something that was said or done that would reflect on his testimony, would not afford a ground of impeachment. It was admitted by the court, as shown by the explanation, as bearing on the credibility of Arnold King. Arnold King had not been asked about it, and the State simply introduced the fact that after he had retired as a witness he had a conversation with his mother and sister, without stating what that conversation was, or that it had any reference whatever to anything connected with the case. It certainly ought not to be a ground of impeachment that a son and brother would talk to his mother and sister, unless that was in some way connected with the case to show something was said or done that would reflect upon him as a witness.

Another bill recites Mrs. J. K. King testified for the defendant. On her cross-examination counsel for the State asked the following question: "Did your daughters, Bertha King and Nellie King, ever tell you after the last trial, that they were going to change their statements because they could not stand to see Bill go to the penitentiary?" and in response to this the witness stated that neither of her girls made such a statement to her. Appellant excepted to this, and the court then made this statement: "The court instructs the jury that so far as any other trial is concerned the jury will not consider that, if they know about that, for any purpose, but that the court will let the question and answer stand, with the understanding that the jury will not consider a former verdict for any purpose." On another trial this testimony should not be permitted.

Another bill recites that Carl Graham testified for the State. On cross-examination he admitted that on the night of the homicide he, in company with Mark Mahan, went to the home of J. W. King, the father of the witness Bertha King, and that he went there for the purpose of telling J. W. King and wife that there was nothing in the

charge which was being made by Bill Carter against his brother, Clyde Graham, to the effect that Clyde Graham had raped Bertha King, the daughter of J. W. King; and on cross-examination by the defendant the witness testified that he signed the letter hereinafter set out and correctly copied. Bertha King testified in the presence and hearing of the jury that the witness Carl Graham wrote and signed the letter hereinafter set out and fully copied, and delivered the same to her, with the request that she deliver the said letter to Miss Mae Rowe. The witness Carl Graham testified to material facts, in behalf of the State, at the instance and request of the State, and also testified to facts tending to show that Clyde Graham did not drop his knife near where he was killed on the night of the homicide, and at the instance of the State, and in the presence of the jury, testified to facts tending to show that Bill Carter was jealous of Clyde Graham. The letter is then set out directed to Miss Mae Rowe:

"Dear Friend  I will try to write you a few lines to let you know what about that trouble

"Say May Mr. Bishop is going to have you in this trial he is going to try to prove by you that Cly raped you  dont you swear no such He cant prove it for I am the best witness you would have and they dont care for ruining your caracter, and I can save it for you if you will just sware he never done it  so I would like to see you sunday if you can come to Mr. Kings

"You let Bertha no whether you can come sunday or not and I will come up here and see you and tell you how to work it if you dont they are going to ruin your caracter for ever and it would kill your ma if she knew it strait so dont let her no it please

as ever Carl Graham."

Appellant offered this for the purpose of showing that Carl Graham, one of the principal witnesses in behalf of the State, was seeking to suppress testimony and thereby aid the State in the prosecution, and also as a circumstance tending to corroborate the testimony of Bertha King to the effect that Carl Graham had induced her to swear in favor of the State on a former trial of the case, and for the purpose of showing that Carl Graham, Mark Mahan and Jim Graham had entered into a conspiracy to send Bill Carter to the penitentiary on false testimony, and for the purpose of showing that Carl Graham was seeking to suppress testimony, in order to accomplish the said purpose. The court excluded this letter and refused to allow same to be introduced as evidence. The court explains this by saying that he desired to say that Miss May Rowe did not testify as a witness in this case, and he could not see that the letter to her had any relevancy to the issues in this case. The letter was addressed to Miss Mae Rowe, who, as the court understands, was a reputable young lady in the Sipe Springs community, and nothing to the contrary was argued or stated by the defendant's witnesses or his counsel; that he felt that it would be

improper and indelicate to inject her name into the case and cause
her to be humiliated by giving publicity to a letter which did in fact
reflect upon her character in any way, but indicated a desire upon
the part of the writer to save it from being smirched and to save her
from being scandalized. The witness was an adverse witness to ap-
pellant, and a brother of the deceased, and for the purpose of showing
that he was suppressing testimony, and as a general reflection upon
him, and as fabricating testimony and as bearing upon his feelings and
interest, etc., in that case, we are inclined to the opinion that this tes-
timony was admissible.

Another bill recites practically the same matters as did the former
bill and includes the letter above quoted. The letter, in the attitude of
the bill of exceptions, was admissible as showing intent and the interest·
that this witness was taking in the case as well as on the issue of
whether or not he was trying to suppress testimony or to fabricate it.

Another bill recites that Bill Wilson testified that he was the father-
in-law of defendant; that about three years ago appellant had married
his daughter; that he now lives in Milam County, having moved from
Love County, Oklahoma, to Milam County; that he only lived in Okla-
homa less than twelve months. That some time in the latter part of
November, 1912, he had started to Gorman, and while on the road he
met a man named Pritchard. Pritchard got in witness' buggy and
they started en route to Gorman. Soon afterward, while in the road,
he met parties whom he took to be movers. There were several of them
and a wagon or two. His mule became frightened at the vehicles, and
the first thing he knew Bill Carter jumped out of the first wagon or
came from behind it, and had a brand new shotgun in his hands, and
presented it on witness and demanded him to halt a time or two; that
he did not remember whether he said halt or not but he said, "I am
going to kill you," and he took deliberate aim at him and he jumped
out of the buggy and hid behind the buggy and mule, and when he
jumped behind the buggy the man Pritchard was right behind him;
that he must have been close to him when he jumped out of the buggy;
that defendant dropped down on his knees and was trying to shoot
him under the mule, and Pritchard ran in between himself and appel-
lant; that Pritchard began to talk to him and urge him not to shoot,
and that appellant continued in his attempt to shoot under the mule.
There are several pages of this testimony, going into the details of
this assault and incidents and matters growing out of the matter. This
testimony was not admissible, and to say the least of it was very hurt-
ful and harmful. Upon another trial this matter should not be per-
mitted to go before the jury. If appellant had taken the stand as a
witness, and an indictment had been preferred against him for this
attack, that fact or the indictment or prosecution might be used under
our authorities as a means of attacking the testimony of appellant, or
it might be used if he was prosecuted as affecting the issue of the sus-
pended sentence request.

Another bill shows the wife of appellant was called as a witness in

the presence and hearing of the jury. Upon another trial this will not occur. As explained by the court, however, it may have amounted to nothing, inasmuch as the court says he suspected that Mrs. Myrtle Carter, wife of defendant, who was called as Mrs. Myrtle Wilson, was the wife of defendant but called by her maiden name, and upon inquiry ascertained such to be the fact. He then informed the district attorney she would not be a competent witness, and she was not placed upon the stand. As explained there was no error shown, but upon another trial the wife of appellant should not be so called.

For the reasons indicated the judgment is reversed and the cause remanded.

*Reversed and remanded.*

PRENDERGAST, PRESIDING JUDGE.—Evidently the word "not" was not in the court's charge, for no complaint was made thereof in the court below—its insertion must have been an error of the clerk in copying.

I think the court's charge wherein he told the jury if they believe from the evidence beyond a reasonable doubt appellant shot and killed deceased, "not for the purpose of protecting his person from unlawful violence from Clyde Graham and not because of reasonable apprehension at the time that the said Clyde Graham was using or was about to use unlawful violence upon him, the defendant, then he can not justify the killing of said Graham, if he did kill him, as done in his lawful defense." This unquestionably is the law, was applicable in this case, and was presenting the question from the State's standpoint.