CARTER v. STATE. (No. 3808.)

(Court of Criminal Appeals of Texas. Jan. 12, 1916. State's Rehearing Denied March 8, 1916.)

1. HOMICIDE ⬡═286—TRIAL—ERROR IN INSTRUCTION.

In a prosecution for murder, the insertion of the word "not" before the word "presumed," in a charge otherwise correct under the statute, relating to the presumption of intent from the use of a deadly weapon, was reversible error.

[Ed. Note.—For other cases, see Homicide, Cent. Dig. §§ 586–591; Dec. Dig. ⬡═286.]

2. HOMICIDE ⬡═300—TRIAL—INSTRUCTIONS.

In a prosecution for murder, a charge on the subject of self-defense, that there must be evidence of some act manifesting an intention to execute the threats mentioned, but omitting the words "or that it so reasonably appeared to the defendant at the time," was erroneous.

[Ed. Note.—For other cases, see Homicide, Cent. Dig. §§ 614, 616–620, 622–630; Dec. Dig. ⬡═300.]

3. HOMICIDE ⬡═300—TRIAL—INSTRUCTIONS.

In a prosecution for murder, where the court had in its charge fully presented the proposition that if defendant killed deceased, not to protect himself from some unlawful violence, and not because of reasonable apprehension of violence, he could not justify the act as done in lawful defense, it was error to unduly emphasize that element of the case by again charging thereon.

[Ed. Note.—For other cases, see Homicide, Cent. Dig. §§ 614, 616–620, 622–630; Dec. Dig. ⬡═300.]

4. CRIMINAL LAW ⬡═418—EVIDENCE—ADMISSIONS—ACQUIESCENCE OR SILENCE.

In a prosecution for murder, remarks made mostly out of the hearing of the defendant by the witness and a third person were inadmissible, though such remarks were related to the defendant in a friendly conversation which took place on the following day.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 968–972; Dec. Dig. ⬡═ 418.]

5. WITNESSES ⬡═352—IMPEACHMENT — COMPETENCY OF EVIDENCE.

In a prosecution for murder, the fact that a witness, after testifying, was seen talking to his mother and sister in a "suspicious attitude," without showing something that was said or done that would reflect on his testimony, was inadmissible to impeach the testimony of the witness.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. § 1152; Dec. Dig. ⬡═352.]

6. WITNESSES ⬡═318—CORROBORATION—EVIDENCE—HEARSAY.

In a prosecution for murder, the testimony of a witness that neither of her daughters, also witnesses, had told her after a former trial that they were going to change their statements because they could not stand to see the defendant go to the penitentiary, was inadmissible.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 1084–1086; Dec. Dig. ⬡═318.]

7. WITNESSES ⬡═374—IMPEACHMENT — EVIDENCE.

In a prosecution for murder, a letter addressed to a person not a witness, written by a witness who was adverse to defendant and a brother of the deceased, tending to prove that he was suppressing and fabricating the testimony, was admissible as showing the intent and interest of the witness in the case, as well as that he was trying to suppress or fabricate the testimony.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 1201, 1202; Dec. Dig. ⬡═374.]

8. HOMICIDE ⬡═158(4)—EVIDENCE — OTHER OFFENSES.

In a prosecution for murder, evidence of the fact that the defendant had threatened to shoot his father-in-law on a former occasion was inadmissible.

[Ed. Note.—For other cases, see Homicide, Cent. Dig. § 296; Dec. Dig. ⬡═158(4).]

Prendergast, P. J., dissenting in part.

Appeal from District Court, Comanche County; J. H. Arnold, Judge.

Bill Carter was convicted of murder, and he appeals. Reversed and remanded.

S. W. Bishop and J. B. McEntire, both of Gorman, and J. R. Stubblefield, of Eastland, for appellant. Gib Callaway, Dist. Atty., of Comanche, and C. C. McDonald, Asst. Atty. Gen., for the State.

DAVIDSON, J. Appellant was allotted 25 years in the penitentiary for murder.

This is the second appeal, the first being reported in 170 S. W. 739. The case is practically as before, with the exception that two of the witnesses, Bertha and Nellie King, testified this time for appellant. On the former trial they were state's witnesses. This involved some change in the testimony so far as their evidence is concerned. There was a witness named Wilson who testified on this trial in regard to a difficulty between himself and appellant, which was not in evidence on the former trial. Quite a number of exceptions were reserved to the charge of the court and refusal to give special charges. These will be noticed in a general way so they may not occur upon another trial.

[1] Among other things, this quotation is made from the court's charge:

"When a homicide takes place to prevent murder or the infliction of serious bodily injury, and the weapon or means used by the person attempting to commit such murder, or to inflict such injury, is such as would have been calculated to produce that result, it is *not* to be presumed that the person so using or attempting to use such weapon designed to commit murder or to inflict serious bodily injury."

This would have been a correct charge with the underscored word "not" omitted from the charge, but as given it was exactly the reverse of the statutory requirement.

[2] This quotation is also made:

"When a defendant accused of murder seeks to justify himself on the ground of threats to do him serious bodily injury, he is permitted to introduce evidence of the threat or threats so made; but the same are not to be regarded as affording a justification unless it be shown that, at the time of the homicide, by some act then done an intention was manifest to execute the threat or threats so made."

---

⬡═For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
183 S.W.—56

Upon another trial, we suggest that this phase of the charge be amended so as to include the idea that "or that it so reasonably appeared to the defendant at the time."

[3] This expression also occurs in the charge:

"If however, you believe from the evidence beyond a reasonable doubt that the defendant with a shotgun fired upon and killed the deceased, Clyde Graham, not for the purpose of protecting his person from unlawful violence from the said Clyde Graham, and not because of reasonable apprehension at the time that the said Clyde Graham was using, or was about to use, unlawful violence upon him, the defendant, then he cannot justify the killing of said Graham, if he did kill him, as done in his lawful defense."

In view of the whole charge and the emphasis of the various provisions of the charge in regard to the question of self-defense, we are of opinion this should not have been given. We suggest upon another trial this clause be omitted. It is deemed unnecessary to go into a discussion of those matters further than above stated.

[4] A bill of exceptions recites that Jim Graham was permitted, over objection of appellant, to testify as follows:

"I remember an occasion some time before the killing, when Bill Carter, Clyde Graham, and I and Iva Lee Stephenson, Bertha King, and Nellie King, went to Oakland to preaching. We walked, and we went from Carl's house and back to Carl's house. I went with Nellie King, Clyde Graham went with Iva Stephenson, and Bill Carter went with Bertha to Oakland, and on return from Oakland, at the request of Bill Carter, we changed partners, and Bill Carter came home with Iva Lee, I came home with Nellie King, and Clyde Graham came home with Bertha King. At the time Bill wanted me to change partners we were about 150 or 200 yards from Oakland. Nellie and I and Bertha King and Clyde Graham went on home, and we had been there some time before Bill Carter and Iva Lee Stephenson came up. I do not know whether Bill and Iva Lee went the same road which we went, or not. When Bill Carter and Iva Lee came up to Carl's house, I went with her to her home. Bill Carter and Iva Lee Stephenson came to Carl's gate, and Bill came in, and told me to go home with Iva Lee Stephenson, and I did not know why he wanted me to do that, and, when I got out there, Iva Lee Stephenson told me she would not go on the rest of the way with him. I then went on home with Iva Lee Stephenson. She said she would not go on any further with Bill Carter. I did not know what Bill had done, or tried to do."

We are of opinion these matters that occurred between the witness and Iva Lee Stephenson and the conversation, being out of the presence and hearing of the defendant, should not have been permitted to go to the jury. Various objections were urged, which we deem unnecessary to discuss. We think this testimony should be excluded upon another trial. The court let it in upon the theory, it seems from his explanation, that most of this was in the presence of the defendant, except the statement of Iva Lee Stephenson made to Jim Graham as they started to the home of Miss Stephenson, and these statements were told to the defendant the next day, when the witnesses state that they talked and laughed about what transpired the night before, the information being brought home to the defendant on the next day after the trip to Oakland, referred to in the bill. We do not think this statement of the judge cures this error. This testimony should not go to the jury. The same may be said of bill No. 14, referring to the same matter.

Another bill shows that the witness Carl Graham at the request of appellant went with him to Cameron for the purpose of seeing appellant's wife; that witness had a conversation with the wife in reference to inducing her to go back and live with her husband, which she declined. He then repeats what was said by the wife in regard to the matter, in which she declined to live with appellant. What the wife said in regard to this matter seems to be inadmissible. The fact, however, that appellant sought to obtain the consent of his wife to live with him again, perhaps, was admissible; but her statements in regard to the matter would not be. Upon another trial, such testimony will not be permitted to go to the jury.

[5] Another bill shows that Arnold King testified for the state, and on cross-examination stated that on the night of the homicide Bill Carter came to his father's house and made the statement that Clyde Graham had raped his sister, and that he was seeking and trying to get the officers after the said Clyde Graham. Be it further remembered that, prior to the time that the said Arnold King went on the stand, Jim Graham had testified, at the instance of the state, and on cross-examination by defendant stated that, at a former trial of the case, he had not given to Arnold King a knife while in the town of Comanche, and during the trial of the case, and further that he had not seen a knife lying near where his brother had been killed, and further, on cross-examination of the witness Arnold King, the said witness had made a statement at a former trial of this case, and during the trial, and while in Comanche, the witness, Jim Graham, had delivered to him a knife, and at the time of doing so the said Jim Graham had made the statement that they might want to see the knife, and that he would tell them the knife was at home. And further be it remembered that after the witness Arnold King had testified to the said facts, and had retired from the witness stand, the state then placed witnesses B. T. Simmons and M. L. Harris on the witness stand, and they testified in the presence and hearing of the jury, and over the protest and objections of the defendant, that, soon after the witness Arnold King had retired from the witness stand, they had seen the said witness, Arnold King, in close consultation with his mother and with Bertha King, in the office of the county attorney, and while talking to his mother and sister, Bertha King, who were witnesses in the case, was in a suspicious attitude, but

that they did not know what the said Arnold King told his mother or sister. Various and sundry objections were urged to this. We believe that this should not have gone to the jury as impeaching testimony of Arnold King. The mere fact that he talked to his mother and sister after he had testified before the jury, without showing something that was said or done that would reflect on his testimony, would not afford a ground of impeachment. It was admitted by the court, as shown by the explanation, as bearing on the credibility of Arnold King. Arnold King had not been asked about it, and the state simply introduced the fact that after he had retired as a witness he had a conversation with his mother and sister, without stating what that conversation was, or that it had any reference whatever to anything connected with the case. It certainly ought not to be a ground of impeachment that a son and brother would talk to his mother and sister, unless that was in some way connected with the case to show something was said or done that would reflect upon him as a witness.

[6] Another bill recites Mrs. J. K. King testified for the defendant. On her cross-examination counsel for the state asked the following question:

"Did your daughters, Bertha King and Nellie King, ever tell you, after the last trial, that they were going to change their statements, because they could not stand to see Bill go to the penitentiary?"

In response to this, the witness stated that neither of her girls made such a statement to her. Appellant excepted to this, and the court then made this statement:

"The court instructs the jury that so far as any other trial is concerned the jury will not consider that, if they know about that, for any purpose, but that the court will let the question and answer stand, with the understanding that the jury will not consider a former verdict for any purpose."

On another trial this testimony should not be permitted.

[7] Another bill recites that Carl Graham testified for the state. On cross-examination he admitted that on the night of the homicide he, in company with Mark Mahan, went to the home of J. W. King, the father of the witness Bertha King, and that he went there for the purpose of telling J. W. King and wife that there was nothing in the charge which was being made by Bill Carter against his brother, Clyde Graham, to the effect that Clyde Graham had raped Bertha King, the daughter of J. W. King; and on cross-examination by the defendant the witness testified that he signed the letter hereinafter set out and correctly copied. Bertha King testified in the presence and hearing of the jury that the witness Carl Graham wrote and signed the letter hereinafter set out and fully copied, and delivered the same to her, with the request that she deliver the said letter to Miss May Roe. The witness Carl Graham testified to material facts, in behalf of the state, at the instance and request of the state, and

also testified to facts tending to show that Clyde Graham did not drop his knife near where he was killed on the night of the homicide, and at the instance of the state, and in the presence of the jury, testified to facts tending to show that Bill Carter was jealous of Clyde Graham. The letter is then set out directed to Miss May Roe:

"Dear Friend: I will try to write you a few lines to let you know what about that trouble. Say May Mr. Bishop is going to have you in this trial he is going to try to prove by you that Cly raped you dont you swear no such He cant prove it for I am the best witness you would have and they dont care for ruining your caracter, and I can save it for you if you will just sware he never done it so I would like to see you sunday if you can come to Mr. Kings You let Bertha no whether you can come sunday or not and I will come up here and see you and tell you how to work it if you dont they are going to ruin your caracter for ever and it would kill your ma if she knew it strait so dont let her no it please As ever Carl Graham."

Appellant offered this for the purpose of showing that Carl Graham, one of the principal witnesses in behalf of the state, was seeking to suppress testimony, and thereby aid the state in the prosecution, and also as a circumstance tending to corroborate the testimony of Bertha King to the effect that Carl Graham had induced her to swear in favor of the state, on a former trial of the case, and for the purpose of showing that Carl Graham, Mark Mahan, and Jim Graham had entered into a conspiracy to send Bill Carter to the penitentiary on false testimony, and for the purpose of showing that Carl Graham was seeking to suppress testimony, in order to accomplish the said purpose. The court excluded this letter and refused to allow same to be introduced as evidence. The court explains this by saying that he desired to say that Miss May Roe did not testify as a witness in this case, and he could not see that the letter to her had any relevancy to the issues in this case. The letter was addressed to Miss May Roe, who, as the court understands, was a reputable young lady in the Sipe Springs community, and nothing to the contrary was argued or stated by the defendant's witnesses or his counsel; that he felt that it would be improper and indelicate to inject her name into the case and cause her to be humiliated by giving publicity to a letter which did not in fact reflect upon her character in any way, but indicated a desire upon the part of the writer to save it from being smirched and to save her from being scandalized. The witness was an adverse witness to appellant, and a brother of the deceased, and for the purpose of showing that he was suppressing testimony, and as a general reflection upon him, and as fabricating testimony and as bearing upon his feelings and interest, etc., in that case, we are inclined to the opinion that this testimony was introducible.

Another bill recites practically the same matters as did the former bill, and includes the letter above quoted. The letter, in the attitude of the bill of exceptions, was admis-

sible as showing intent and the interest that this witness was taking in the case, as well as on the issue of whether or not he was trying to suppress testimony or to fabricate it.

[8] Another bill recites that Bill Wilson testified: That he was the father-in-law of defendant. That about three years ago appellant had married his daughter. That he now lives in Milam county, having moved from Love county, Okl., to Milam county. That he only lived in Oklahoma less than twelve months. That some time in the latter part of November, 1912, he had started to Gorman, and while on the road he met a man named Pritchard. Pritchard got in witness' buggy, and they started en route to Gorman. Soon afterward, while in the road, he met parties whom he took to be movers. There were several of them and a wagon or two. His mule became frightened at the vehicles, and the first thing he knew Bill Carter jumped out of the first wagon or came from behind it, and had a brand new shotgun in his hands, and presented it on witness and demanded him to halt a time or two. That he did not remember whether he said halt or not, but he said, "I am going to kill you," and he took deliberate aim at him, and he jumped out of the buggy and hid behind the buggy and mule, and when he jumped behind the buggy the man Pritchard was right behind him. That he must have been close to him when he jumped out of the buggy. That defendant dropped down on his knees and was trying to shoot him under the mule, and Pritchard ran in between himself and appellant. That Pritchard began to talk to him and urge him not to shoot, and that appellant continued in his attempt to shoot under the mule. There are several pages of this testimony, going into the details of this assault and incidents and matters growing out of the matter. This testimony was not admissible, and, to say the least of it, was very hurtful and harmful. Upon another trial, this matter should not be permitted to go before the jury. If appellant had taken the stand as a witness, and an indictment had been preferred against him for this attack, that fact or the indictment or prosecution might be used, under our authorities, as a means of attacking the testimony of appellant, or it might be used if he was prosecuted as affecting the issue of the suspended sentence request.

Another bill shows the wife of appellant was called as a witness in the presence and hearing of the jury. Upon another trial, this will not occur. As explained by the court, however, it may have amounted to nothing, inasmuch as the court says he suspected that Mrs. Myrtle Carter, wife of defendant, who was called as Mrs. Myrtle Wilson, was the wife of defendant, but called by her maiden name, and upon inquiry ascertained such to be the fact. He then informed the district attorney she would not be a compe-tent witness, and she was not placed upon the stand. As explained, there was no error shown; but upon another trial the wife of appellant should not be so called.

For the reasons indicated, the judgment is reversed, and the cause remanded.

PRENDERGAST, P. J. Evidently the word "not" was not in the court's charge, for no complaint was made thereof in the court below; its insertion must have been an error of the clerk in copying.

I think the court's charge, wherein he told the jury if they believe from the evidence beyond a reasonable doubt appellant shot and killed deceased, "not for the purpose of protecting his person from unlawful violence from Clyde Graham, and not because of reasonable apprehension at the time that the said Clyde Graham was using or was about to use unlawful violence upon him, the defendant, then he cannot justify the killing of said Graham, if he did kill him, as done in his lawful defense." This unquestionably is the law, was applicable in this case, and was presenting the question from the state's standpoint.